**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| Jeffrey Wilson, | ) | Case No. 2:23-cv-04058-BCW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Netflix, Inc., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S SUGGESTIONS IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

Page

INTRODUCTION...................................................................................................... 1

BACKGROUND ....................................................................................................... 2

    **A.**   **Plaintiff's Novel:** *Queen Anne's Revenge* ................................................ 2

    **B.**   **The** *Outer Banks* **Series** ............................................................................ 3

LEGAL STANDARD ............................................................................................... 5

ARGUMENT ............................................................................................................ 6

**I.**    *Queen Anne's Revenge* **Does Not Contain Copyrightable Expression That is Substantially Similar to** *Outer Banks*. ................................................................. 6

    **A.**   **Plot** ............................................................................................................... 7

    **B.**   **Characters** ................................................................................................. 13

    **C.**   **Setting** ....................................................................................................... 16

    **D.**   **Theme** ........................................................................................................ 17

    **E.**   **Mood and Pace** ......................................................................................... 17

    **F.**   **Dialogue** ................................................................................................... 18

CONCLUSION ....................................................................................................... 18

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Haley,*
    460 F. Supp. 40 (S.D.N.Y. 1978)..............................................................8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..............................................................................5

*Beal v. Paramount Pictures Corp.,*
    20 F.3d 454 (11th Cir. 1994) .................................................................11

*Benay v. Warner Bros. Entertainment,*
    607 F.2d 620, 625 (9th Cir. 2010) .....................................................9, 13

*Berkic v. Crichton,*
    761 F.2d 1289 (9th Cir. 1985) ...............................................................11

*Briggs v. Blomkamp,*
    70 F. Supp. 3d 1155 (N.D. Cal. 2014), aff'd 714 F. App'x 712 (9th Cir. 2018)......................15

*Brown v. Perdue,*
    No. 04 CIV. 7417 (GBD), 2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005), aff'd,
    177 F. App'x 121 (2d Cir. 2006) ..........................................................12

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.,*
    489 F.3d 1129 (11th Cir. 2007) .............................................................8

*Campbell v. Walt Disney Co.,*
    718 F. Supp. 2d 1108 (N.D. Cal. 2010) ...........................................17, 18

*Corbello v. Valli,*
    974 F.3d 965 (9th Cir. 2020) ..................................................................7

*Dubay v. King,*
    366 F. Supp. 3d 1330 (M.D. Fla. 2019)...................................................7

*DuBay v. King,*
    844 F. App'x 257 (11th Cir.), cert. denied, 142 S. Ct. 490 (2021).........13

*Ferman v. Jenlis, Inc.,*
    224 F. Supp. 3d 791 (S.D. Iowa 2016) ...................................................5

*Fisher v. United Feature Syndicate, Inc.,*
    203 F.3d 834, 2000 WL 135167 (10th Cir. Feb. 7, 2000) .......................6

*Frye v. YMCA Camp Kitaki*,
617 F.3d 1005 (8th Cir. 2010) ............................................................7, 12, 16

*Frye v. Young Men's Christian Ass'n of Lincoln, Nebraska*,
No. 4:98CV3105, 2009 WL 2229522 (D. Neb. July 20, 2009), *aff'd sub nom* ......................12

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
462 F.3d 1072 (9th Cir. 2006) ..........................................................11, 13

*Harter v. Disney Enterprises, Inc.*,
No. 4:11CV2207 CDP, 2012 WL 4324417 (E.D. Mo. Sept. 20, 2012) ...................7, 8, 10, 17

*Hartman v. Hallmark Cards, Inc.*,
639 F. Supp. 816 (W.D. Mo. 1986), aff'd, 833 F.2d 117 (8th Cir. 1987) ................................8

*Hartman v. Hallmark Cards, Inc.*,
833 F.2d 117 (8th Cir. 1987) ..........................................................6

*Hoch v. MasterCard Int'l Inc.*,
284 F. Supp. 2d 1217 (D. Minn. 2003) ...............................................7, 13

*Idema v. Dreamworks, Inc.*,
162 F. Supp. 2d 1129 (C.D. Cal. 2001) ..........................................13, 16

*Kouf v. Walt Disney Pictures & Tel.*,
16 F.3d 1042 (9th Cir. 1994) ..........................................................18

*Marcus v. ABC Signature Studios, Inc.*,
279 F. Supp. 3d 1056 (C.D. Cal. 2017) ..........................................14, 17

*Masterson v. Walt Disney Co.*,
821 F. App'x 779 (9th Cir. 2020) ..........................................................6

*McMahon v. Prentice-Hall, Inc.*,
486 F. Supp. 1296 (E.D. Mo. 1980).........................................................7

*Nelson v. PRN Prods., Inc.*,
873 F.2d 1141 (8th Cir. 1989) ..........................................................1, 5, 6, 7

*Olson v. National Broad. Co., Inc.*,
855 F.2d 1446 (9th Cir. 1988) ..........................................................18

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
602 F.3d 57 (2d Cir. 2010).........................................................6

*Peters v. West*,
692 F.3d 629 (7th Cir. 2012) ..........................................................6

iii

*Porous Media Corp. v. Pall Corp.*,
    186 F.3d 1077 (8th Cir. 1999) ........................................................6

*Ricketts v. CBS Corps.*,
    439 F. Supp. 3d 1199 (C.D. Cal. 2020) .......................................17

*Schoolhouse, Inc. v. Anderson*,
    275 F.3d 726 (8th Cir. 2002) .........................................................7

*Sheldon Abend Revoocable Trust v. Spielberg*,
    748 F. Supp. 2d (S.D.N.Y. 2010) .................................................8

*Silas v. Home Box Off., Inc.*,
    201 F. Supp. 3d 1158 (C.D. Cal. 2016), aff'd, 713 F. App'x 626 (9th Cir.
    2018) .............................................................................................15

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020) .......................................................9

*Tanikumi v. Walt Disney Co.*,
    616 F. App'x at 521 (3d Cir. 2015).............................................14

*Thompson v. Looney's Tavern Prods., Inc.*,
    204 F. App'x 844 (11th Cir. 2006) ...............................................8

*Vallejo v. Narcos Prods. LLC*,
    833 F. App'x 250 (11th Cir. 2020) ..............................................13

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986)......................................................11, 12

*Whitehead v. Netflix, Inc.*,
    No. 22-cv-04049-CRB, 2022 WL 17342602 1, 20 (N.D. Cal. Nov. 30, 2022).....................16

*Winstead v. Jackson*,
    509 F. App'x 139 (3d Cir. 2013) ...................................................6

*Wooten v. Netflix, Inc.*,
    No. 1:20-CV-5166-TCB, 2021 WL 4864744 (N.D. Ga. May 25, 2021)........................ *passim*

*Zambito v. Paramount Pictures Corp.*,
    613 F. Supp. 1107, 1112 (E.D.N.Y. 1985) .................................12

**Other Authorities**

Federal Rule of Procedure 12(b)(6) ...........................................................1, 5

iv

## INTRODUCTION

Plaintiff Jeffrey D. Wilson alleges that Defendant Netflix, Inc.'s series *Outer Banks* infringes the copyright in his novel *Queen Anne's Revenge*, because both "involve a hunt for treasure from a famous ship that is hidden by a former slave." Dkt. 1 ("Compl.") at 7. The literary canon, however, is replete with historically-based pirate stories, from *Treasure Island* and *Peter Pan* to the *Pirates of the Caribbean, The Goonies*, and *The Road to El Dorado* films. Just as these works do not all infringe one another, *Outer Banks* does not infringe *Queen Anne's Revenge*. As one court noted in dismissing similar allegations by the author of a different Blackbeard-inspired novel, "to analyze plots at such a high level of abstraction would render every work involving a hunt for buried treasure susceptible to copyright infringement." *Wooten v. Netflix, Inc*., No. 1:20-CV-5166-TCB, 2021 WL 4864744, at \*5 (N.D. Ga. May 25, 2021). The "classic concept of a treasure hunt" is not copyrightable. *Id.* at \*3. For a plaintiff to plead substantial similarity, he must allege that "the treasure hunt theme in one work [is] expressed in a substantially similar manner as in [the] earlier work." *Id.*

Here, the works are not substantially similar in protectable expression as a matter of law. *Outer Banks* is a present-day teen action drama about a tightknit group of friends, whereas *Queen Anne's Revenge* toggles between historical fiction about 18th-century pirates and a 20th-century account of a multi-generational family. Plaintiff identifies only a *single* scene allegedly in common between the two lengthy works, in which characters find treasure in a well. But "retrieval of treasure from a deep shaft…naturally arises from the generalized theme of a treasure hunt," and is "therefore [] not copyrightable." *Id.* at \*4. This Court thus can and should dismiss Plaintiff's complaint with prejudice under Rule 12(b)(6) for lack of substantial similarity based on a comparison of the works. *Nelson v. PRN Prods., Inc.*, 873 F.2d 1141, 1143–44 (8th Cir. 1989).

## A.   Plaintiff's Novel: *Queen Anne's Revenge*

Plaintiff self-published *Queen Anne's Revenge* on June 10, 2013, and registered the novel on September 15, 2020. Compl. ¶¶ 7–10. According to the novel's acknowledgements, Plaintiff spent "years of research" to write it. Ex. A at 5. Roughly half of the novel is historical fiction about the real-life pirate Captain Teach, also known as Blackbeard, and his first mate, a former slave named Henri, aboard the slave-ship-turned-pirate-ship *Queen Anne's Revenge* (a real ship found off the coast of North Carolina). Interspliced with the pirate tale is the story of Henri's descendants in 1990s California, as they make amends for events that occurred many years before.

The novel opens in 1718, when Blackbeard, accompanied by Henri and an indigenous character named Big Sky, orders workers to bury treasure in a well in a graveyard. Dkt. 1-1 ("Ex. A") 8–12. Blackbeard murders all but Henri, stacking their decapitated heads on a spiked iron fence post. *Id.* 12–14. The novel then jumps to the 1930s when Henri's descendant, Rose, then a young child, learns from her father, Ezekiel, that he believes their ancestor hid a treasure. *Id.* 16–20, 22–25. Rose witnesses Ezekiel killed by someone apparently after Ezekiel's maps. *Id.* 25–27. The novel fast-forwards to the 1990s in Southern California, where Rose is at the last stage of her life and taking stock of her legacy, including repairing an estranged relationship with her daughter, Isabelle. *Id.* 28–36. Rose gives her granddaughter, a mature and brainy elementary school-aged child named Sophie, a watch from Ezekiel. *Id.* 96, 116–17, 121–23, 172. Sophie and her mother then drive to Folsom prison to pick up Sophie's father, Alex, who has been released after being incarcerated for most of Sophie's life for a drug crime for which (he later learns) Isabelle was responsible. *Id.* 96–102, 295–96. Sophie and Alex discover coordinates etched into the watch, and Sophie convinces her mother that the three of them should follow the coordinates on a cross-

country road trip to North Carolina for the treasure. *Id.* 180, 205–17. The weeks-long road trip brings the family closer together and culminates with the discovery of the graveyard well from the first chapter, but it seems Sophie doesn't find the treasure. *Id.* 306–14. The novel concludes in the early 2000s when it is revealed that Sophie did find the treasure, which she keeps hidden in the house she lives in with her husband and young daughter. *Id.* 338–47.

Plaintiff alleges that all four seasons of the Series—including one that has not yet been released or even produced—infringe the copyright in his novel. *Id.* ¶ 23.[1]

**B.    The *Outer Banks* Series**

Netflix released *Outer Banks* Season One on April 15, 2020 (before Plaintiff registered his work). Season Two on July 30, 2021, and Season Three on February 23, 2023. Compl. ¶¶ 17–21.

**Season One.** *Outer Banks* "follows four troublemaking teenagers—John B, Pope, Kiara, and J.J.—as they navigate family strife and class conflict in the Outer Banks of North Carolina," divided along socioeconomic lines between rich "Kooks" and poor "Pogues." *Wooten*, 2021 WL 4864744, at *1. John B and his friends, who are Pogues, clash with the Kooks, including wealthy developer Ward Cameron and his son Rafe. S1:E1 at 28:59–30:35.[2]

After a hurricane, the Pogues happen upon a sunken boat, which holds a compass that belonged to John B's missing father. *See, e.g.*, *id.* at 12:55–14:32, 18:29–24:57, 47:21–50:48; S1:E2 at 40:52–43:34; S1:E3 at 1:53–4:02. The Pogues learn John B's father was on the verge of finding the shipwrecked Royal Merchant, rumored to have $400 million in gold, and decide to continue his search. S1:E3 at 2:27–5:53, 39:33–43:39; S1:E4 at 0:30–1:34, 33:09–36:19. John B

---

[1] Plaintiff points to *Outer Banks* creators' alleged statements that they relied on other books and authors for inspiration for the Series to allege they had access to *Queen Anne's Revenge*. *Id.* ¶ 25. Because the works are not substantially similar, the Court can rule in Defendant's favor without addressing the disputed question of access.
[2] All three seasons of *Outer Banks* have been manually filed with the Court. "S" refers to Season and "E" refers to episode.

learns his father was injured and thrown overboard by Ward, who had been helping John B's father

find the gold. S1:E8 at 6:38–14:05. Meanwhile, John B falls for Ward's daughter, Sarah, even

though she is a Kook. S1:E4 at 42:40–45:00. John B learns that the former owner of the Cameron

mansion was Denmark Tanny, a former slave and the sole survivor of the Royal Merchant. John

B deduces that Tanny hid gold from the ship, leaving clues behind. The clues lead the friends to

the house of Ms. Crain, where they find the gold hidden in a well. Ward retrieves the gold first and

loads it onto his jet bound for the Bahamas. S1:E6 at 45:01–50:01; S1:E8 at 37:57–38:30. Just as

he is boarding, Sheriff Peterkin arrives to arrest Ward for the murder of John B's father, but Ward's

son, Rafe, kills her. S1:E8 at 41:46–43:21. Ward frames John B for the Sheriff's murder. S1:E9 at

2:21–3:03, 7:28–8:41, 16:52–17:31. John B and Sarah flee by boat and are rescued by a cargo ship

bound for the Bahamas. S1:E10 at 33:57–35:22, 38:31–39:29, 45:52–53:30.

**Season Two.** John B and Sarah unsuccessfully try to steal back the gold from Ward's

Bahamian house before John B is arrested in the Outer Banks. S2:E1 at 39:20–46:47; E2 at 0:05–

2:00, 41:08–49:49; E4 at 20:32–21:51, 37:30–40:00, 41:28–44:21. Federal agents eventually

inspect the gun used to kill Peterkin and find enough evidence to arrest Rafe, freeing John B. S2:E5

at 43:55–45:09; E6 at 0:30–2:00. Pope learns that he is Tanny's descendant. S2:E6 at 20:00–22:17.

A rich woman named Carla Limbrey approaches Pope looking for a key that will lead her to the

cross of Santo Domingo, another treasure from the Royal Merchant. *Id.* at 28:44–29:15. The

Pogues give her a fake key in exchange for a recording that leads to Ward's arrest. *Id.* at 29:15–

32:00. To escape arrest, Ward blows up his boat, seemingly committing suicide, but leaves behind

a confession to Peterkin's murder, allowing Rafe to be freed. *Id.* at 39:00–42:30, E7 at 0:05–2:00.

Pope then discovers a clue on the ceiling in his great-grandmother Mee-Maw's apartment,

which eventually leads the Pogues to the cross. S2:E5 at 24:54–27:50; E8 at 33:30–38:18. Rafe,

however, takes the cross for himself and escapes by boat. S2:E9 at 2:50–3:00, 15:20–16:00, 17:06–18:00. The Pogues sneak onto the boat where they find Ward alive. *Id.* at 39:30–44:30, 45:14–45:30; S2:E10 at 19:30–20:00. While at sea, the Pogues try to recover the gold and cross. S2:E10 at 23:20–46:35. John B fights Ward, and the group escapes to a deserted island. *Id.* at 41:28–43:05, 50:30–53:45. It is revealed that John B's father, Big John, is alive. *Id.* at 56:17–56:50.

**Season Three.** John B's group hunts for a new treasure: the lost city of El Dorado. This time, the friends face a man named Carlos Singh. S3:E1 at 38:00–41:42, 42:25–43:25; E3 at 32:00–34:40. They follow clues to a South America jungle, where John B and Sarah help Big John solve riddles to discover El Dorado in a cave. S3:E10 at 14:30–25:30, 27:00–30:48, 49:30–57:00. Carlos pulls a gun on Big John, who tosses dynamite into the cave, killing Carlos. *Id.* at 57:00–1:01:15. One of Carlos's henchmen is about to shoot Sarah, but Ward—also searching for the treasure— tackles the shooter off a cliff, where both die. *Id.* at 1:04:58–1:06:38. Big John succumbs to a gunshot wound he sustained in the melee. *Id.* at 1:06:45–1:09:44. Months later, back at the Outer Banks, John B and his friends are being recognized for finding El Dorado when a mysterious old man asks their help looking for Blackbeard's treasure. *Id.* at 1:11:10–1:14:30.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

Courts in the Eighth Circuit may dismiss a copyright infringement claim for lack of substantial similarity on a Rule 12(b)(6) motion based on a comparison of the plaintiff's and defendant's works themselves. *See Nelson*, 873 F.2d at 1143-44; *Ferman v. Jenlis, Inc.*, 224 F.

Supp. 3d 791, 802–03 (S.D. Iowa 2016) ("This Court may properly determine substantial similarity of expression between the [respective works] as a matter of law on a motion to dismiss."). This is because where, as here, the "district court ha[s] before it, complete copies of both [works]," it is "in proper position to apply the substantial similarity test." *Nelson*, 873 F.2d at 1143–44 ("The trial judge could properly determine the matter of substantial similarity as a matter of law and did so by granting defendants' motion to dismiss the copyright count on the ground that it failed to state a claim for infringing use."). Expert opinion is not needed. *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir. 1987). Here, both *Queen Anne's Revenge*, an exhibit to the Complaint, and *Outer Banks*, which is necessarily embraced by the Complaint, are properly considered on a motion to dismiss. *Nelson*, 873 F.2d at 1143–44; *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).[3]

## ARGUMENT

I.  ***Queen Anne's Revenge* Does Not Contain Copyrightable Expression That is Substantially Similar to *Outer Banks*.**

To state a claim for copyright infringement, Plaintiff must allege that he owned the alleged infringed work and that Netflix copied it. *Nelson*, 873 F.2d at 1142. Where, as here, there are no direct allegations of copying, Plaintiff may allege copying by pleading (1) defendant had access to the copyrighted work, and (2) substantial similarity between the works. *Id*.

"Determination of substantial similarity involves a two-step analysis." *Id*. "First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an

---

[3] Nearly all circuits recognize the appropriateness of moving to dismiss for lack of substantial similarity. *E.g.*, *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp*., 602 F.3d 57, 64 (2d Cir. 2010); *Winstead v. Jackson*, 509 F. App'x 139, 142 (3d Cir. 2013); *Peters v. West*, 692 F.3d 629, 631 (7th Cir. 2012); *Masterson v. Walt Disney Co*., 821 F. App'x 779, 781 (9th Cir. 2020); *Fisher v. United Feature Syndicate, Inc*., 203 F.3d 834 (Table), 2000 WL 135167, at *3–5 (10th Cir. Feb. 7, 2000).

intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression." *Id*. (cleaned up). Because the extrinsic test depends on objective criteria, it can be determined as a matter of law. *Id*. The "substantial similarity" inquiry focuses exclusively on the similarity of the protected elements of the works. It is a "longstanding" principle that copyright law does not protect ideas, only expression. *Frye v. YMCA Camp Kitaki*, 617 F.3d 1005, 1008 (8th Cir. 2010). "[H]istorical facts, common phrases and scenes-a-faire are similarly unprotected." *Corbello v. Valli*, 974 F.3d 965, 971 (9th Cir. 2020) (cleaned up); *accord Frey*, 617 F.3d at 1008. Thus, a "plaintiff owns no copyright on the rendition of historical facts." *McMahon v. Prentice-Hall, Inc.*, 486 F. Supp. 1296, 1303 (E.D. Mo. 1980). Rather, "facts and ideas . . . are free for the taking." *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 728–29 (8th Cir. 2002).

To allege substantial similarity under the extrinsic test, Plaintiff must identify substantial, protectable similarities between elements such as plot, theme, dialogue, mood, setting, pace, and characters. *Harter v. Disney Enterprises, Inc.*, No. 4:11CV2207 CDP, 2012 WL 4324417, at *2 & n.2 (E.D. Mo. Sept. 20, 2012) (citing *Berkic v. Crichton*, 761 F.2d 1289, 1291 (9th Cir. 1985)). The Court "must 'filter out and disregard the non-protectible elements in making its substantial similarity determination.'" *Hoch v. MasterCard Int'l Inc.*, 284 F. Supp. 2d 1217, 1222 (D. Minn. 2003) (quoting *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir.2002)). Focusing only on protectable expressions, the works are radically different as to each element.

**A. Plot**

Courts regularly reject attempts to characterize patently dissimilar works at a highly abstract level of generality to evade their many differences, as Plaintiff tries here. *See Dubay v. King*, 366 F. Supp. 3d 1330, 1343 (M.D. Fla. 2019) (noting such characterizations could lead to the erroneous conclusion that the movies The Wizard of Oz and Star Wars are substantially

similar).[4]

**Treasure Hunt.** Plaintiff alleges that both works involve a hunt for treasure, left behind by a former slave, from a famous ship (albeit different historical ships). Compl. ¶ 28(a). This is "nothing more than a general plot idea, which is not protectible." *Harter,* 2012 WL 4324417 at *4 (E.D. Mo. Sept. 20, 2012) (cleaned up); *see also BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142–43 (11th Cir. 2007) ("The idea of hunting a formidable whale at the lead of an eccentric captain is not protected by copyright law[.]"). As other courts have recognized, "the classic concept of a treasure hunt would not be copyrightable." *Wooten*, 2021 WL 4864744, at *3; *Hartman v. Hallmark Cards, Inc*., 639 F. Supp. 816, 821 (W.D. Mo. 1986), aff'd, 833 F.2d 117 (8th Cir. 1987) (if presence of ships in works established substantial similarity "then the plaintiff's copyrighted material would certainly violate any copyright which may cover the Peter Pan property, a property which clearly includes fairies, pirates, and pirate ships").

That is particularly true of non-copyrightable ideas that are also rooted in historical facts. The *Queen Anne's Revenge* was formerly a slave ship—that is a historical fact. Some of the crew, including a "cabin boy" joined Blackbeard's crew—that is a historical fact.[5] "No claim of copyright protection can arise from the fact that [a] plaintiff has written about [] historical and factual items, even if we were to assume that [the defendant] was alerted to the facts in question by reading [the plaintiff's work]." *Alexander v. Haley*, 460 F. Supp. 40, 45 (S.D.N.Y. 1978). "One cannot build a story around a historical incident and then claim exclusive right in the use of the incident." *Thompson v. Looney's Tavern Prods., Inc*., 204 F. App'x 844, 849 (11th Cir. 2006)

---

[4] Where, as here, one work contains subplots that are absent in the other, that further undermines substantial similarity. *See Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d, 200 210 (S.D.N.Y. 2010) (no substantial similarity where the defendant's work was "rife with subplots" while the plaintiff's had none).

[5] *See* https://www.qaronline.org/history/blackbeard-history-dreaded-pirate, (https://tinyurl.com/4ccwt755), a website cited in the Bibliography to *Queen Anne's Revenge*. Ex. A at 350.

(cleaned up). Otherwise, Plaintiff's work would infringe on the copyrights of all historical fiction about Blackbeard that predates *his* novel, and historical fiction would cease to be a viable genre altogether.[6]

The Ninth Circuit's decision in *Benay v. Warner Bros. Entertainment* is instructive. There, the court held that there was no substantial similarity as a matter of law between a screenplay and film, both called *The Last Samurai*, in which an American war veteran goes to Japan to help the Imperial Army by training it in the methods of modern Western warfare to fight against a samurai uprising; the protagonists are both authors of non-fiction studies on war who have flashbacks to battles in America; common scenes include meetings with the Emperor and numerous battle scenes; both works are reverential toward Japanese culture; and the leader of the samurai rebellion acts as an important foil to the American protagonist, who is spiritually transformed by his experience in Japan. 607 F.3d 620, 625 (9th Cir. 2010), overruled on other grounds by *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). The court held that although "these similarities may appear substantial," many involved unprotectable elements, like historical facts—i.e., "there actually was a samurai uprising in the 1870s, the Satsuma Rebellion, led by Saigo Takamori, who is sometimes referred to as 'The Last Samurai.'" *Id.* at 626. Here, too, at most, the alleged similarities between the works are based on historical facts— i.e., the actual presence of freed slaves in the pirate trade of the 1700s, when Blackbeard converted a slave ship into his pirate ship.

In any event, these unprotectable ideas and facts are expressed entirely different in the two works even though "both works involve shipwrecks and treasure hunts." *Wooten*, 2021 WL

---

[6] Plaintiff's contention that the *unpublished* Season Four's reference to Blackbeard infringes his copyright, Compl. ¶ 23, highlights that his allegations are based on alleged similarities of ideas and historical facts, not protectable expression.

4864744 at *5. In *Outer Banks*, a band of teenage friends follow a series of complex clues in search of multiple treasures in North Carolina and in South America, facing off against violent rival treasure-hunters. S1:E3 at 2:27–5:53, 39:33–43:39, E4 at 0:30–1:34, 33:09–36:19; S2:E6 at 28:44–29:15; S3:E1 at 38:00–41:42, 42:25–43:25, E3 at 32:00–34:40. They want the treasure so they can break out of poverty and go "full Kook." S1:E3 at 5:00–5:55. By contrast, the treasure hunters in *Queen Anne's Revenge* are a school-aged girl and her parents, who follow a single clue (a watch with the coordinates to where the treasure is buried) on a family road trip to the site of the treasure, with no competing treasure-hunters. Ex. A 180, 205–217. And when the girl finds the treasure, rather than cashing out, she keeps the discovery hidden through her adulthood. Ex. A 338–347. Moreover, while *Outer Banks* focuses on the ever-sprawling hunt for riches, *Queen Anne's Revenge* spends longer on the accumulation of the pirate's booty itself by Blackbeard, Henri, and others aboard the ship in the 1700s, then on the discovery of the treasure, and the characters ultimately conclude that the real "treasure is the memories residing in [their] heart." Ex. A 243.

Courts have found plots with far more similarities to lack substantial similarity as a matter of law. For example, a district court in this Circuit found that plaintiffs' illustrated children's story *Santa Paws: The Story of Santa's Dog* was not substantially similar as a matter of law to Disney's *Santa Buddies: The Legend of Santa Paws* and *The Search for Santa Paws. Harter*, 2012 WL 4324417 at *4. The court reached this conclusion even though the works all included a "threat to the Christmas holiday or spirit, which is then saved by a talking Christmas dog… named 'Paws,' 'Santa Paws,' or 'Puppy Paws'"; characters like Santa, talking dogs, elves, other helpers, and an antagonist "who is trying to ruin Christmas or cause some other type of trouble"; a setting in the North Pole, as well as an American city or town; and a magical icicle or ice crystal. *Id.* at *2.

The Eleventh Circuit likewise held there was no substantial similarity between defendant's *Coming to America* and the plaintiff's work even though both works told the story of "young crown princes from wealthy royal families coming to America, where they meet the women they will marry" and "a strong ruler" who "initially prefers that the prince enter into an arranged marriage." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 460 (11th Cir. 1994). In a case arising out of the series *Six Feet Under*, the Ninth Circuit held there was no substantial similarity between works where fathers who operate family-run funeral homes die, resulting in operation of the homes by two sons, one of whom has been estranged prior to the father's death. *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1081 (9th Cir. 2006). The Ninth Circuit also found no substantial similarity between works that were both about "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and the "adventures of a young professional who courageously investigates, and finally exposes, the criminal organization." *Berkic v. Crichton*, 761 F.2d at 1293. And the Second Circuit held there was no substantial similarity as a matter of law between the book "Fort Apache" and the film "Fort Apache: The Bronx," even though both works involved policemen in the hostile environment of the 41st Precinct and featured the murder of black and white policemen with handguns at close range, cockfights, drunks, stripped cars, prostitutes, rats, third- or fourth-generation Irish policemen and several foot chases. *Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1986). In each case the plots had far more similarities than here, and in each case the courts found that the works were not substantially similar as a matter of law.

**Well Scene**. Despite alleging that three ten-episode seasons of *Outer Banks* infringe his 347-page novel, the *only* common scene that Plaintiff alleges is one in which a character finds treasure in a well. Compl. ¶ 28(c)–(k). Scenes involving "retrieval of treasure from a deep shaft,"

however, "are classic scènes à faire and therefore are not copyrightable." *Wooten*, 2021 WL 4864744, at *4 (rejecting that well scene in *Outer Banks* was similar to scene in a different plaintiff's novel). Such unprotectable elements appear in many works, including *Goonies*, *Raiders of the Lost Ark*, and *Pirates of the Caribbean*. Indeed, in *Zambito v. Paramount Pictures Corp.*, the court held that "treasure…hidden in a cave inhabited by snakes, … fire … used to repel the snakes, [and] birds [that] frighten an intruder in the jungle…all are indispensable elements to the treatment of 'Raiders [of the Lost Ark's]' theme, and are, as a matter of law, simply too general to be protectable." 613 F. Supp. 1107, 1112 (E.D.N.Y. 1985).

The expression of these stock "well" scenes in the two works is also entirely different. In *Outer Banks*, John B and his friends sneak under the house of rumored-axe murderer Mrs. Crain. S1:E6 at 44:16–50:03. John B is lowered into a well where he dives into the muck for treasure only to come up with a piece of a human skull. *Id.* at 43:44. He demands to be pulled up and, on the way up, finds gold behind a loose brick. *Id.* at 44:05. Mrs. Crain shoots at the friends with a shotgun, and they flee. *Id.* at 44:16–50:03. John B reveals he found the gold and the friends celebrate that they are now "kook rich." *Id.* 35:28–49:50. In *Queen Anne's Revenge*, by contrast, Sophie and her parents follow Sophie's map of the coordinates by canoe to an ancient graveyard. Ex. A 306–314. The family finds a fence post with a fragment of a skull bone—presumably one of the men Blackbeard decapitated (Ex. A 13–14)—before finding a closed-up well.[7] Ex. A 307–

---

[7] Unlike in *Queen Anne's Revenge*, the origin of the skull in *Outer Banks* is unknown, but even if it, too, had come from a murder scene, "that [two works] begin with a murder [is] unprotectable scenes a faire that precludes a finding of substantial similarity." *Brown v. Perdue*, No. 04 CIV. 7417 (GBD), 2005 WL 1863673, at *7 (S.D.N.Y. Aug. 4, 2005), aff'd, 177 F. App'x 121 (2d Cir. 2006). The discovery of a bone in a treasure hunting story, too, is unprotectable scenes-a-faire. *See Frye v. Young Men's Christian Ass'n of Lincoln, Nebraska*, No. 4:98CV3105, 2009 WL 2229522, at *2 (D. Neb. July 20, 2009), *aff'd sub nom. Frye v. YMCA Camp Kitaki*, 617 F.3d 1005 (8th Cir. 2010) (no substantial similarity based on shared features of castles, dragons, knights, wizards, sorceresses, and a host of other stock creatures in a shared medieval fantasy setting); *Walker*, 784 F.2d at 50 (scenes involving foot chases and morale problems of police officers in the Bronx were standard lore in police fiction and not entitled to copyright protection).

12

308. Alex lowers Sophie into the well where she finds gold dust and gemstones, but she does not tell her parents because she worries the riches will change her family. *Id.* 340–43.

### B. Characters

Plaintiff fails to draw actionable parallels between characters, as set forth below. Moreover, the many characters in each work with no counterpart is further proof of the lack of substantial similarity. *Vallejo v. Narcos Prods. LLC*, 833 F. App'x 250, 259–60 (11th Cir. 2020); *Funky Films*, 462 F.3d at 1078–79.

***Henri and Denmark Tanny****.* Plaintiff alleges these characters are both former slaves who hide treasure from the ships on which they work. Compl. ¶ 27(a). This unprotected idea's expression, however, is markedly different. Henri is a protagonist with dialogue and perspective, whereas Tanny never appears and has no dialogue—he is only briefly depicted in a painting in Season One. *See* S1:E4 at 9:40–9:44, 10:25–10:45, 11:00–11:09. *Queen Anne's Revenge*'s main characters are all descendants of Henri, whereas Pope is the only main character in *Outer Banks* who is related to Tanny. S2:E6 at 20:00–22:20. "To the extent that the two characters are similar, it is only with respect to traits that are so generalized and/or cliché as to be nearly scenes a faire of the…genre." *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1186 (C.D. Cal. 2001). Having been enslaved and leaving clues to heirs "flow naturally from the works' shared" historical premise of freed slaves in 18th-century piracy. *Benay*, 607 F.3d at 626 (cleaned up); *DuBay v. King*, 844 F. App'x 257, 265 (11th Cir.), cert. denied, 142 S. Ct. 490 (2021) (no substantial similarity based on characters who shared "knightly heritage, travel to different times and parallel worlds, Western attire, fictionalized Alamo histories, and knife-wielding" because "these similarities are scènes à faire"); *Hoch*, 284 F. Supp. 2d at 1223 (no substantial similarity based on shared characters of "adventure-seeking friends who embark on a road trip that has at its heart the love of baseball, as

shown through tradition, history and legends associated with the national pastime").

***Ezekiel and Big John Rutledge***. Plaintiff claims that Ezekiel (Rose's father) and Big John are both treasure-hunters in the Outer Banks who argue with their children and have a violent confrontation with someone who tries to steal information about the treasure. Compl. ¶ 27(b). It is not enough that both characters are engaged in treasure-hunting. *See Marcus v. ABC Signature Studios, Inc*., 279 F. Supp. 3d 1056, 1068–69 (C.D. Cal. 2017) (finding that two mother characters working in the medical field is a non-distinct trait that cannot be copyrighted). Such "prototypical…characters" are "too indistinct to merit copyright protection." *Tanikumi v. Walt Disney Co.*, 616 F. App'x at 521 (3d Cir. 2015) (no protection for characters with "intense sisterly bond, an untrue lover, and a resolution in which the female protagonist comes into her own without the help of a man"). In any event, they are very different. Ezekiel appears briefly in a single chapter in which he scans the beach for treasure left by his ancestor and, later, for a moment in Rose's dream. Ex. A 15–26. Big John, by contrast, is a central character in absentia before appearing and driving the plot of Season Three. S2:E10 at 56:17–56:50. And while Ezekiel is after his own ancestor's treasure, Big John is not. The other alleged similarities are mischaracterizations. Ezekiel and Rose do not argue over the treasure; John Routledge and John B have tension over John Routledge's desire to keep clues from John B's friends. S3:E3 at 6:30-6:56. The man who kills Ezekiel is after clues to the treasure (Ex. A at 25-26); Ward attacks John B because he wants to cut John B out of the search and keep the gold for himself.  (S1:E8 at 6:38–14:05).

***Rose and Mee-Maw.*** Plaintiff claims that Rose and Mee-Maw are similar, Compl. ¶ 27(c), but these characters bear no resemblance. In *Queen Anne's Reveng*e, the reader meets Rose as a child and then again as an elderly grandmother who has survived two husbands and amassed wealth despite growing up with almost nothing. Ex. A 30, 271, 332. The complex protagonist

exchanges witty banter with friends, *id*. at 218, confronts her own prejudices, *id*. at 276, grieves the deaths of her two sons, *id*. at 35–36, nurtures her special relationship with her granddaughter, *id*., and faces her mortality, *id*. at 124. In contrast, Mee-Maw, an ancillary character in *Outer Banks* appearing in just two short scenes, reveals to Pope their family's ties to Tanny. S2:E6 at 19:40–22:10, 23:27–24:15. "Courts do not find characters to be substantially similar when two characters have noticeable differences." *Silas v. Home Box Off., Inc*., 201 F. Supp. 3d 1158, 1177 (C.D. Cal. 2016), aff'd, 713 F. App'x 626 (9th Cir. 2018) (cleaned up). Apart from these stark differences, Plaintiff's generalization that both characters inherit a family heirloom ignores critical differences in expression. The watch Sophie gets from Rose is the only clue in *Queen Anne Revenge's* treasure hunt. The key Pope shows Mee-Maw is one in a long series of clues. S2:E5 at 24:30-27:42. And while Rose knew about the treasure from observing her father search for it and encourages the treasure-hunting road trip, Ex. A at 242–44, Mee-Maw never searched for the treasure and tells Pope she does not want to discuss the key. S2:E5 at 24:30-27:42. Where a "keepsake" in both works is a different item and plays a different role in the story, it does not support a finding of substantial similarity. *See Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1169 (N.D. Cal. 2014), aff'd 714 F. App'x 712 (9th Cir. 2018).

**Sophie and John B.** Plaintiff claims that Sophie and John B. both are estranged from a missing parent and their remaining parent due to work, receive a valuable broken heirloom, go on a treasure hunt that involves going to an archive, and run wild due to a lack of supervision. Compl. ¶ 27(d). These allegations are unprotected, based on mischaracterizations of the works, or both. In *Queen Anne's Revenge*, Sophie's father is not missing—he is incarcerated—and she is not estranged from her mother, who homeschools her despite working three jobs. Ex. A 96–102. In *Outer Banks*, John B's father is presumed dead until he returns in Season Three, and his mother

left when he was four for unspecified reasons. S:1E1 at 5:05-5:45. Sophie and John B have still more differences. Elementary school-aged Sophie is sheltered by her family and hunts for treasure only under her parents' supervision. Ex. A at 60–71, 172, 244. John B, on the other hand, is an older teen who drives his own car, lives alone, and whose hunt for treasure involves multiple character arcs not present for Sophie—such as the romance with Sarah (who is of a different economic class), false imprisonment after being framed for murder, attempting to avoid foster care, and navigating complex friendships. S1:E7 at 24:14–31:09. Finally, characters who obtain family heirlooms (in Sophie's case as a gift, and in John B's case by discovering it in a sunken ship after a hurricane) and search archives as part of their treasure hunts are unprotected scenes-a-faire, present in multiple works like *Indiana Jones* and *The DaVinci Code*. *See Frye*, 617 F.3d at 1008–09 ("[M]ost of the characters in each play are standard to a medieval theme.").

## C. Setting

Plaintiff contends that both works share substantially similar settings, Compl. ¶ 30, but *Queen Anne's Revenge* takes place in California, at sea, or on a cross-country road trip to North Carolina. *Outer Banks* is set in Outer Banks, with trips to the Bahamas and South America.

To the extent both works are partially set in the Outer Banks, that setting is scenes-a-faire of a premise of searching for treasure from a historical ship off North Carolina's coast. *Idema*, 162 F. Supp. 2d at 1186 ("There could hardly be a story about nuclear smuggling out of Russia which would *not* include at least some scenes in Russia."). Plaintiff's allegations about features of the Outer Banks—i.e. wetlands, open roads, windswept beaches, lighthouses, coastal ferry system, and beach towns, Compl. ¶ 30(b)-(g)—thus do not support a finding of substantial similarity. *See Whitehead v. Netflix, Inc*., No. 22-cv-04049-CRB, 2022 WL 17342602 1, 20 (N.D. Cal. Nov. 30, 2022) (finding that scenes in school hallways and classrooms are unprotectable scenes-a-faire that

flow from stories set in schools). The same is true of the alleged "impoverished homestead" since "[c]ommonplace settings such as houses, front yards… and so on, without more, cannot show substantial similarity." *Id*. at 21. Plaintiff also claims both works feature a colonial graveyard and site of a murder. Compl. ¶ 30(h), (i)-(j). But stock settings like mausoleums and graveyards naturally flow from the plot of a treasure hunt. *Wooten*, 2021 WL 4864744, at *4; *cf. Harter*, 2012 WL 4324417 at *3 ("setting of the North Pole in a Christmas story [is] standard").

### D. Theme

Plaintiff contends that both works include the themes of "struggle for survival, respect, and the right to live free between economic classes," "the clothes make the man," and "if you cannot see racism then it does not exist," Compl. ¶ 29(a)-(c). But "themes of racism and poverty … are also too general to be protectable." *Ricketts v. CBS Corps.*, 439 F. Supp. 3d 1199 at 1214–15 (C.D. Cal. 2020). To the extent they exist in the works, they are also expressed differently. *Queen Anne's Revenge* explores these themes through Henri's interactions with enslaved people and European pirates, Isabelle's and Alex's interracial relationship, and Rose's relationships with the people she hires around the house, while *Outer Banks* explores class-conflict through its "Pogue vs. Kook" rivalry, and racism through an intersectional lens by which Pope*,* a Pogue, experiences racism differently than Kelce—a rich, Black Kook. *See Marcus*, 279 F. Supp. 3d at 1068 ("While both families may be dealing with the struggles of being a minority in a majority culture, the message in each work is distinct. Therefore, the themes of the two works are not substantially similar.").

### E. Mood and Pace

Plaintiff makes only the conclusory allegation that the works share "substantially similar moods and paces." Compl. ¶ 31. "The time period within which [a work] is set is a factor for determining the pace." *Campbell v. Walt Disney Co*., 718 F. Supp. 2d 1108, 1115 (N.D. Cal. 2010).

*Queen Anne's Revenge* jumps back and forth between the 18th and 20th centuries, while *Outer Banks* is almost all in the present. Moreover, each of the thirty-three chapters in *Queen Anne's Revenge* takes place on its own single (non-consecutive) day, while *Outer Banks* takes place over several consecutive months. *See Kouf v. Walt Disney Pictures & Tel.*, 16 F.3d 1042, 1046 (9th Cir. 1994) (no similar pace between story told over 24 hours and another over several days).

Nor are the moods similar. *Queen Anne's Revenge* has a dark and violent mood as it describes Blackbeard's ruthless swashbuckling and the conditions of the enslaved people aboard the ship, and a hopeful, light mood as it neatly ties up the loose ends among Henri's descendants with a storybook ending. Ex. A at 243, 312, 344. The prevailing mood in *Outer Banks* is one of upbeat teen action-adventure, with none of the more graphic violence inflicted by Blackbeard in *Queen Anne's Revenge*. *Campbell*, 718 F. Supp. 2d at 1114 (moods of works not substantially similar where one contained scenes involving drug dealers and the hero chopping off his own finger while the other had "'happy upbeat overtones'").

### F. Dialogue

A plaintiff needs to identify "extended similarity of dialogue" to support a claim of substantial similarity. *See Olson v. National Broad. Co., Inc.,* 855 F.2d 1446, 1450 (9th Cir. 1988). Plaintiff alleges *no* similar dialogue; there is none.

### CONCLUSION

For the forgoing reasons, Plaintiff's Complaint should be dismissed with prejudice.

Dated: June 2, 2023           KING & SPALDING LLP

By: */s/ Kelly Perigoe*          

Kelly Perigoe (admitted *pro hac vice*)
Jeffrey Hammer (admitted *pro hac vice*)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 613-4770
kperigoe@kslaw.com
jhammer@kslaw.com

Negassi H. Tesfamichael (admitted *pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave., NW Suite 900
Washington, D.C. 20006
Telephone: (202) 626-2398
Facsimile: (202) 626-3737
ntesfamichael@kslaw.com

*Attorneys for Defendant Netflix, Inc.*

Robert P. Berry, #46236 (MO)
David C. Baxter, #62165 (MO)
BERRY SILBERBERG STOKES PC
16150 Main Circle Drive, Suite 120
St. Louis, Missouri 63017
Telephone: (314) 480-5882
Facsimile: (314) 480-5884
rberry@berrysilberberg.com
dbaxter@berrysilberberg.com

*Attorneys for Defendant Netflix, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2023, the foregoing was submitted electronically for filing through this Court's CM/ECF system to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/ Kelly Perigoe*
Kelly Perigoe